UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KATHLEEN GORMAN-GEISLER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-756-SEB-JMS |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 22] filed by Defendant, Federal Express Corporation ("Federal Express"), pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, Kathleen Gorman-Geisler, brought this suit against Federal Express, her former employer, pursuant to Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Gorman-Geisler alleges that Federal Express improperly denied her continued long-term disability benefits to which she was entitled by the terms of the Federal Express Long Term Disability Plan ("the LTD Plan").  Federal Express asserts that it denied Ms. Gorman-Geisler benefits because her medical records did not include significant objective findings to substantiate her claimed disability.  For the reasons detailed in this entry, we GRANT Federal Express's motion, and enter final judgment accordingly.

**Factual Background**

*Terms of the LTD Plan*

Federal Express administrates the LTD Plan in order to provide long-term disability benefits for its employees.  Def.'s Ex. 5 (LTD Plan) at AR 339.  In order to qualify for benefits under the plan, a covered employee must be "disabled" as that term is defined by the Plan, to wit:

> Disability or Disabled shall mean either an Occupational Disability or a Total Disability; provided, however, that a Covered Employee shall not be deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms.[1]

---

[1] The Federal Express Employee Benefits Book (which is part of the administrative record that was presented before the Benefits Review Committee) further describes "significant objective findings" as follows:

**Significant Objective Findings (Proof of Disability)**

Significant objective findings of a disability are necessary to substantiate the period of time your health care professional indicates you are disabled.  Significant objective findings are those that can be observed by your health care professional through objective means, not just from your description of the symptoms.  Objective findings include:

- Medical examination findings
- Test results
- X-ray results
- Observation of anatomical, physiological or psychological abnormalities

(continued...)

AR 343.

The LTD Plan provides that a covered employee may collect benefits equivalent to sixty percent of the employee's monthly income for up to two years if the employee suffers from an "occupational disability," which is defined in the plan as follows:

> Occupational Disability shall mean the inability of a Covered Employee, because of a medically-determinable physical impairment or Mental Impairment (other than an impairment caused by a Chemical Dependency) to perform the duties of his regular occupation.

AR 347.  An employee may only collect benefits as a result of an occupational disability for two years.  AR 360 (LTD Plan § 3.3(c)(3)(i)).  Therefore, in order for an employee to continue collecting disability benefits for longer than two years, the employee must demonstrate that he or she suffers from a "total disability," which is defined in the plan as follows:

> Total Disability shall mean the complete inability of a Covered Employee, because of a medically-determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience.

AR 352.

Discretionary authority for benefits eligibility determinations is vested in the

---

[1](...continued)
> **Pain, without significant objective findings, is not proof of disability.**

AR 332 (emphasis in original).

Federal Express Benefits Review Committee ("BRC"), according to the terms of the Plan:

> Authority of Committee. The committee . . . shall be empowered to interpret the Plan's provisions in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan. The determination of the committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

AR 390.

### *Ms. Gorman-Geisler's Claim for Long-Term Disability Benefits*

Ms. Gorman-Geisler began working for Federal Express in 1992 as an aircraft cleaner and de-icer on a permanent, full-time basis. AR 12, 216. Federal Express concedes that Ms. Gorman-Geisler was a "Covered Employee" and was entitled to long-term disability benefits, if she became disabled as defined by the LTD Plan. Def.'s Mem. at 6.

For six months, from May 10, 2001 to November 7, 2001, Ms. Gorman-Geisler received disability benefits from the Federal Express Short Term Disability Plan. AR 12. On November 8, 2001, she began collecting benefits under the LTD Plan for an Occupational Disability. Ms. Gorman-Geisler collected long term benefits for two years, ending November 7, 2003.[2]

---

[2] At some point in December 2001, further LTD benefits were denied due to a lack of significant objective findings of the disability. AR 254. Ms. Gorman-Geisler appealed the denial, and benefits were reinstated through May 1, 2002, based on the finding that "data in

(continued...)

On May 13, 2003, Ms. Gorman-Geisler was notified by Kemper Insurance Companies ("Kemper"), which managed Federal Express's LTD Plan, that in order for her to continue to receive benefits after November 7, 2003, she would need to meet the definition of "total disability" under the Plan – that is, to demonstrate the inability due to medically determinable physical impairment to work for twenty-five hours per week in a job for which she was (or could become) reasonably qualified.  AR 186-87.  Ms. Gorman-Geisler was directed to provide medical documentation clearly stating significant objective findings substantiating such total disability, id., in response to which she provided documentation of her asserted disability, which was reviewed by a Kemper neurologist.  AR 15.

On October 3, 2003, Kemper sent Ms. Gorman-Geisler a letter informing her that, after review of the clinical data, it had determined that "there [we]re no significant objective findings that would preclude [her] from engaging in any compensable occupation for a minimum of 25 hours a week."  Id.  Ms. Gorman-Geisler appealed that denial on January 30, 2004, and on May 26, 2004, the BRC upheld the denial of benefits. The BRC's June 30, 2004 letter to Ms. Gorman-Geisler informing her of the denial stated that it had reviewed all medical documentation submitted as well as five separate peer

---

[2](...continued)
regards to cervical disc fusion does support [a functional impairment] due to essentially no cervical ROM [range of motion], [or] decreased strength in extremities[.]" AR 256 (chronolog entry for April 22, 2002).  It is not clear from the parties' briefs precisely how or when Ms. Gorman-Geisler's benefits were then reinstated for the period from May 1, 2002, through November 7, 2003.

physician reviews and an independent medical examination ("IME") in reaching its conclusion.  AR 7.

### Clinical Findings Reviewed by the BRC[3]

In April 2001, Ms. Gorman-Geisler, who was then complaining of pain in the right side of her neck, head, and shoulders, underwent an MRI of her cervical spine.  The MRI showed that Ms. Gorman-Geisler had a "mild chronic diffuse disc bulge [and] moderate vertical degeneration of C6-7 disc," "bilobed herniation of the C5-6 disc, larger component posteriorly on the left where the spinal cord is indented and distorted by the herniation," and "left C6 root compression."  The MRI report also noted "[m]ild marginal spondylosis posteriorly on the right side at C4-5" and "small herniation posteriorly on the right at T2-3," neither of which presented neural impingement.  AR 86-87.  A follow-up note from Dr. Edward J. Kowlowitz, M.D., of the Center for Pain Management in Indianapolis, further states that the MRI demonstrated "at least moderate stenosis of the central canal with indentation of the cord."  Ms. Gorman-Geisler was given medication and was referred to Dr. Phillip Pryor, M.D., of The Spine Institute in Beech Grove, Indiana, for surgical evaluation.  AR 82.  Dr. Kowlowitz filled out a Kemper Attending Physician Statement on April 30, 2001, which described Ms. Gorman-Geisler as being able to work with restrictions until June 17, 2001.  AR 88.

Ms. Gorman-Geisler was seen by Dr. Pryor at The Spine Institute on May 4, 2001.

---

[3] All cited sources in support of the clinical findings discussed in this section are from the Administrative Record ("AR") before the BRC.  Def.'s Mem. at 2.

6

She complained of severe pain in her neck, radiating to both shoulders.  AR 83.  Dr. Pryor

diagnosed her with "degenerative disc disease and a herniated disc at C5-6 with

significant compression on the anterior epidural space and into both foramen."  AR 85.

He recommended that "we should not yet jump to a surgical solution. . . . Because

statistically many people will improve if we give them a few weeks, I think it would be a

mistake to move too quickly."  Id.  Dr. Pryor recommended that Ms. Gorman-Geisler

continue physical therapy and he placed her in a cervical brace.

On May 17, 2001, Dr. Kowlowitz amended the Kemper Attending Physician

Statement he had filled out on April 30, 2001, and stated that Ms. Gorman-Geisler was

"totally disabled – unable to work until June 8th after evaluation with Dr. Pryor on June

8th" because "activity increases symptoms."  AR 90.

Ms. Gorman-Geisler had cervical fusion surgery at C5-6, performed by Dr. Pryor,

on June 14, 2001.  On August 20, 2001, Ms. Gorman-Geisler again saw Dr. Pryor and

complained of "a great deal of pain" despite the surgery.  Dr. Pryor stated in his notes that

Ms. Gorman-Geisler's cervical MRI scan showed "no significant foraminal

encroachment" and that "[h]er surgical site looks excellent with no encroachment."  Dr.

Pryor reported that Ms. Gorman-Geisler was "unable to be very active because of her

pain.  I've recommended she continue off work."  AR 91.

On October 1, 2001, Dr. Kowlowitz sent a letter to Kemper summarizing Ms.

Gorman-Geisler's estimated functional capacity.  Dr. Kowlowitz stated that Ms. Gorman-

Geisler was suffering from "post laminectomy syndrome" and stated that "she should not

use her right upper extremity at all for any lifting, pushing, carrying-type of performance at work. Her restrictions at this point are indefinite. She is to use her arm for functionings of normal ADLs [activities of daily living] only. She has no restrictions regarding her low back, sitting, standing, or walking. . . . It is my medical opinion that at this point she should be granted at least a temporary disability." AR 93.

On October 12, 2001, Ms. Gorman-Geisler again saw Dr. Pryor, who reported in his chart note that she was "still having a lot of pain and there is disk degeneration at C6-7. C5-6 is stable." AR 110. Ms. Gorman-Geisler returned to Dr. Pryor on October 24, 2001, complaining of "excruciating pain in the low back going to the left sacroiliac region." She reported that she "does not get out of bed except to take her children to school" and that "she has no support at home and is fearful of divorce as well [as] having difficulty with her children." AR 111.

Ms. Gorman-Geisler returned to Dr. Pryor on November 1, 2001, and stated that she was suffering from headaches and pain in her shoulders, right arm and elbow, as well as low back and both legs. AR 115. A lumbar MRI showed no significant disk disease, herniation, compression, or spinal stenosis; a neck myelogram demonstrated degenerative disk disease at C6-7 but no compression at C5-6. Ms. Gorman-Geisler again stated that she had no family support and "seem[ed] depressed as she was crying in the office." Id. Dr. Pryor stated in his chart note that "[t]here is degeneration at C6-7, but [Ms. Gorman-Geisler's] symptoms certainly are not explained by it. . . . I have no explanation for [pain in her right arm], for on the myelogram/CT scan, there is no longer . . . any compression

8

evident." Id. Dr. Pryor suggested that Ms. Gorman-Geisler consult a rheumatologist because he thought that "it [was] quite likely that there is something else going on" that was causing her multiple areas of pain, possibly including fibromyalgia (with which Ms. Gorman-Geisler had been previously diagnosed). AR 115-16.

On November 2, 2001, Dr Kowlowitz filled out another Kemper Attending Physician Statement which stated that Ms. Gorman-Geisler was "unable to use right upper extremity for any lifting, pushing, carrying type of performance at work." AR 112. He did not release her to return to work, but anticipated that significant clinical improvement would be achieved by May 1, 2002. Id.

Ms. Gorman-Geisler returned to Dr. Pryor on December 3, 2001. Dr. Pryor's chart notes stated that the "X-rays obtained today look great and show good position of the fusion. . . . The patient says that she hurts all over, including her neck, back, legs, and knees, and is unable to stand up for any length of time due to pain in the SI joint area. She has right elbow pain. . . . There is disk degeneration at C4-5 and C6-7." AR 117. On December 21, 2001, Dr. Pryor noted that Ms. Gorman-Geisler had a "diffuse pain syndrome" and that he did not "believe any further surgery will help her. . . . She is quite depressed at this time." He recommended a continued course of treatment with Dr. Kowlowitz to address pain. AR 118.

On December 21, 2001, Dr. Pryor wrote a letter to United Healthcare[4] describing

---

[4] It is not clear from the record what role, if any, United Healthcare holds with respect to Ms. Gorman-Geisler's benefits determinations.

Ms. Gorman-Geisler's degenerative disk disease and pain. The letter stated that: "The patient is completely disabled at 100%, unable to be involved in any type of employment. She is unable to sit for more than a short period nor stand, nor walk and needs to change positions frequently which completely eliminates her with any job she may do. There is an inability to lift more than 5 pounds and she cannot carry any heavy objects. There is also considerable psychologic problems and stress. . . . In summary, the patient is completely disabled at this time from degenerative disk disease." AR 119.

On March 22, 2002, Dr. Kowlowitz stated in a letter to Kemper that he believed Ms. Gorman-Geisler had "total disability based on her hard findings, not just merely subjective complaints of pain. . . . Proper interpretation of the studies and opinions of the physicians should result in awarding her disability rather than denying them for insufficient clinical findings. In addition, the ongoing debilitating chronic pain [and] the depressive psychological features alone should qualify this particular patient for disability." AR 136. On June 12, 2002, Dr. Kowlowitz again indicated to Kemper that, in his opinion, Ms. Gorman-Geisler was unable to work full-time, part-time, or with restrictions, that the restrictions were permanent, that she had reached maximum medical improvement, and that she was totally disabled.[5] AR 141.

_____

[5] In February 2003, Dr. Kowlowitz confirmed these opinions, stating that he did not release Ms. Gorman-Geisler to return to work and did not anticipate significant clinical improvement. He further detailed several functional limitations, including operating machinery, standing, reaching, lifting 1-10 pounds, walking, sitting, and work hours. He did not check boxes indicating she had functional limitations in certain other categories, including fine manipulation and operating a motor vehicle. AR 170.

An MRI of Ms. Gorman-Geisler's thoracic spine on November 30, 2002, showed a normal scan with no significant change compared to her prior thoracic MRI and no abnormalities. A follow-up MRI of her lumbar spine showed mild bilateral facet joint osteoarthrosis, but no stenosis or herniation. AR 154-55.

On December 1, 2002, the Social Security Administration ("SSA") entered a Notice of Award finding Ms. Gorman-Geisler disabled as of April 25, 2001. AR 220-25. The Notice of Award does not indicate the clinical basis for the SSA's finding.

On April 11, 2003, Ms. Gorman-Geisler underwent an EMG and Nerve Conduction Study, conducted by Dr. Mark Janicki, M.D. The test demonstrated that Ms. Gorman-Geisler's right upper extremity showed "some moderate right carpal tunnel syndrome" but "no voluntary motor unit potential activity," which was "extremely unusual." The report stated that "no visible atrophy or rigidity could be seen at this time." AR 166-67.

On August 6, 2003, Dr. Kowlowitz again informed Kemper that Ms. Gorman-Geisler was "functionally disabled [and] cannot work more than 20 hours per week, in a functional work position at Federal Express. The patient is currently on pharmacological interventions for her chronic disabling disorder. Impression is postlaminectomy syndrome, cervical[.]" AR 180.

On September 5, 2003, Dr. Sheldon Meyerson, M.D., a neurosurgeon, conducted a General Peer Review of Ms. Gorman-Geisler's medical documentation. Dr. Meyerson determined that, "[d]espite the description of the pain and extensive treatment, including

surgical and interventional pain management, there are no examination findings and no objective neurological dysfunctions described that would prevent [Ms. Gorman-Geisler] from performing any occupation for 25 hours per week."  AR 189.

On September 18, 2003, Dr. Vaughn Cohan, M.D., a neurologist, conducted a General Peer Review of Ms. Gorman-Geisler's case.  Like Dr. Meyerson, Dr. Cohan determined that the data did not support a functional impairment rendering Ms. Gorman-Geisler unable to work for twenty-five hours per week.  He noted that, with respect to the April 11, 2003 EMG, one possible explanation for the lack of physical findings consistent with the lack of voluntary motor unit potentials was "suboptimal cooperation on the part of the claimant."  AR 192.  Dr. Cohan also stated that he had contacted Dr. Kowlowitz, who had stated that, in order to determine whether Ms. Gorman-Geisler was capable of performing any compensable employment (including a sedentary job) for twenty-five hours per week, he would need to understand the specific job requirements under consideration and review her entire chart.  Id.  Dr. Cohan further stated that "[t]here is no evidence the claimant has impaired endurance for sitting, standing and/or walking and there is no indication that the claimant has any problems with respect to ambulation."  Id.

Ms. Gorman-Geisler was again evaluated at the Center for Pain Management on October 15, 2003, by a physical therapist.  Her discharge summary states that she was observed to sit for approximately twenty-five minutes, stand for less than five minutes, and walk for ten minutes.  AR 22.  The report states that Ms. Gorman-Geisler was "subjectively unable to initiate right upper extremity active movement" and that she

"would not be considered to be able to perform bending, stooping, or twisting." <u>Id.</u>

*Functional Capacity Evaluation*

On November 7, 2003, Ms. Gorman-Geisler underwent a functional capacity evaluation at Manual Therapy Associates in Carmel, Indiana, in order to determine her physical work tolerances. The summary report of the evaluation states that test findings and clinical observations "suggest the presence of near full, though not entirely full, effort on Mrs. Gorman-Geisler's behalf. In describing sub-maximal effort, this evaluator is by no means implying intent. Rather, it is simply stated that Mrs. Gorman-Geisler can do more physically at times than was demonstrated during this testing day." AR 30. Further, the report stated that "[o]verall test findings, in combination with clinical observations, suggest some minor inconsistency to the reliability/accuracy of Mrs. Gorman-Geisler's subjective reports of pain/limitation. . . . [She] provided near full physical effort with the testing today. . . . She gave reliable reports, but she does exhibit some signs of inappropriate illness behavior and underestimates some of her abilities. She may be able to do more physically at times than she perceives." AR 31. The report concluded that Ms. Gorman-Geisler "would not be a candidate to tolerate physical work. . . . [S]he can not return to work full time. She would have difficulty returning to any work activity due to her limitations as noted." <u>Id.</u>

During certain of the physical tests performed by Ms. Gorman-Geisler during her functional capacity evaluation, her scores suggested "less than full effort during testing."

The report explains that certain scores related to strength and movement are expected to form specific statistical patterns of score distribution if the subject is performing with full physical effort.  AR 48-50.  Ms. Gorman-Geisler's scores did not consistently form these expected distributions.  In addition, Ms. Gorman-Geisler did not exhibit "competitive test performance" throughout her testing day;[6] however, heart rate analysis suggested that she was putting forth good effort on the tasks, and her efforts "remained clinically consistent, suggestive of good consistent effort on her behalf."  AR 50-51.

In addition, several tests were conducted in order to gauge the reliability of Ms. Gorman-Geisler's self-reports of pain and disability.  On the Waddell Inappropriate Symptoms Questionnaire, Ms. Gorman-Geisler presented five of seven possible inappropriate, anatomically unreasonable responses, which is suggestive of inappropriate illness behavior.  She also complained of anatomically unreasonable pain on a patellar shift test.  AR 52.  However, the report stated that various pain scale ratings performed correlated well with Ms. Gorman-Geisler's subjective reports of pain.  Id.

*Additional Peer Reviews*

On March 9, 2004, a General Peer Review was conducted by Dr. Gerald Goldberg, M.D., a neurologist.  Dr. Goldberg noted the "extremely unusual" findings in the April 11, 2003, EMG Nerve Conduction Study – specifically, that Ms. Gorman-Geisler was

---

[6] Indicators of competitive test performance include: "starting tests prior to the uttered 'START' command, continuing to work after the uttered 'STOP' command, asking for extra practice time, asking to repeat a slow trial, postural accommodation to improve performance, etc."  AR 50.

unable to move her right arm at all even though there were "no voluntary motor unit

potentials . . . [and] no fasciculations or fibrillations or positive waves." AR 198. Dr.

Goldberg opined that the "most obvious" explanation for this was that "the claimant gave

no effort whatsoever in attempt[ing] to move her arm." Id. He also expressed doubt

about the conclusion in Ms. Gorman-Geisler's functional capacity evaluation that she was

unable to function even at a sedentary level. Dr. Goldberg stated that in his opinion "[t]he

Functional Capacity Evaluation appears to be based on [Ms. Gorman-Geisler's] self-

report and not on objective observations and is not compatible with the medical

information that is available." AR 199. In Dr. Goldberg's opinion, "submitted

neurologic documentation does not provide significant objective evidence that would

render the claimant unable to engage in any compensable employment for a minimum of

twenty five hours per week." Id. He recommended that the functional capacity

evaluation be reviewed by a physical medicine physician.

On March 10, 2004, Dr. Anthony Riso, M.D., an anesthesiologist and pain

management specialist, conducted a General Peer Review of Ms. Gorman-Geisler's

documentation. Dr. Riso's opinion was that the functional capacity evaluation

demonstrated "presence of nearly full but perhaps not entirely full effort on the claimant's

behalf with overall inconsistencies that were considered only minor. . . . [I]t was noted the

claimant had a nearly full effort, which did not imply intent [to] hold back full effort, it

was noted that rather the claimant can do more physically at times than was demonstrated

during that particular testing day and that any final vocational or rehabilitation decisions

15

for the claimant should be made with this caveat in mind. " AR 194.  Dr. Riso felt that

Ms. Gorman-Geisler would have the "ability to do sedentary duties such . . . as telephone

work or communications work," and that "[t]he [functional capacity evaluation] findings

do not support a functional impairment that would render the claimant unable to engage

in any compensable employment for a minimum of twenty five-hours per week."  Id.

On March 24, 2004, Dr. Michael Goldman, D.O., a specialist in physical medicine

and rehabilitation, conducted a General Peer Review.  Dr. Goldman noted that Ms.

Gorman-Geisler's "symptoms varied and her physical exam findings varied and were

inconsistent," and that this led to difficulty in diagnosis.  AR 202.  After a review of some

of the procedures undergone by Ms. Gorman-Geisler, he stated that "[t]he bottom line

here is that none of these examinations list any specific physical findings that one would

relate to a functional impairment to a sedentary position."  Id.  With respect to the

functional capacity evaluation, Dr. Goldman noted that "nowhere in any of the doctor's

examinations is there any medical reason for the claimant being unable to move her hand

or arm."  AR 203.  Dr. Goldman concluded that "there is no clinical evidence provided by

any of [the] attending physicians of neuromuscular, musculoskeletal or neurological

findings that would confirm any of the bizarre symptoms that the claimant is

experiencing.  I can find no evidence of a functional impairment that would preclude the

claimant from engaging in any compensable employment for a minimum of 25 hours per

week[.]"  Id.  Dr. Goldman recommended that an Independent Medical Examination

("IME") be conducted to obtain a comprehensive physical examination of Ms. Gorman-

Geisler.

On April 14, 2004, Dr. Fred Lamb, M.D., a pain management and rehabilitation specialist, conducted an IME on Ms. Gorman-Geisler.  Dr. Lamb examined Ms. Gorman-Geisler and reviewed her medical records, and stated that "[t]here is no pathophysiologic process of which I am aware that would explain the etiology of the right shoulder and upper extremity complaints," and also disputed Ms. Gorman-Geisler's diagnosis with postlaminectomy syndrome.  AR 218.  Dr. Lamb concluded that, "[b]ased upon my examination today and review of the medical records, there are insufficient objective findings present today for a determination of total medical disability. . . . In the absence of significant objective findings in the medical records and on examination today, I can determine no functional impairment and can make no recommendation for any restrictions or limitations."  Id.

After Dr. Lamb's IME, Dr. Goldman completed a General Peer Review Addendum on April 29, 2004.  Dr. Goldman reviewed Dr. Lamb's examination report and noted that "[i]n the report I see that Dr. Lamb also finds the claimant's symptoms quite bizarre and he finds numerous physical exam findings that are not consistent with any known neuromuscular or musculoskeletal problem. . . . The objective findings in the [IME] . . . confirmed my review of previous findings that there . . . is no evidence that support[s] a functional impairment that would preclude the claimant from performing sedentary work for 25 hours per week."  AR 207.

*The Instant Lawsuit*

On April 7, 2006, Ms. Gorman-Geisler filed suit against Federal Express in Marion Superior Court.  Ms. Gorman-Geisler's complaint alleges that Federal Express intentionally stopped paying her long-term disability benefits even though it knew she was totally disabled, in violation of ERISA Section 502(a). Compl. ¶ 4.  On May 11, 2006, Federal Express removed this action to federal court, and on November 21, 2006, filed its Motion for Summary Judgment, on which we now rule.

## Legal Analysis

### I.    Standard of Review

Benefit determinations in ERISA cases, pursuant to 29 U.S.C. § 1132(a)(1)(B), are reviewed *de novo*, unless the plan administrator has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan vests discretionary authority in the plan administrator, the standard of review is based on an "arbitrary and capricious" analysis. Patton v. MFS/Sun Life Financial Distributors, Inc., 480 F.3d 478, 486 (7th Cir. 2007); see also Morgan v. Cigna Group Ins., 2003 WL 722804, at *6 (S.D. Ind. 2003) (Barker, J.).

Here, the LTD Plan grants discretionary authority to Federal Express; there is no dispute between the parties on this point.[7]  Accordingly, our review of Federal Express's

---

[7] As we have stated, the LTD Plan states that the Benefits Review Committee "shall be
(continued...)

denial of benefits to Ms. Gorman-Geisler proceeds according to the "arbitrary and

capricious" standard, which entails a review of the administrator's decision in terms of

whether it was reasonable.  Morgan, 2003 WL 722804, at *6; Schaub v. Consolidated

Freightways, Inc. Extended Sick Pay Plan, 895 F. Supp. 1136, 1140 (S.D. Ind. 1995)

(Barker, C.J.).  For a decision to be reasonable, an administrator must have "consider[ed]

the factors that are relevant to the important aspects of the decision, and articulate[d] an

explanation that makes a 'rational connection' between the issue, the evidence, the text

and the decision made."  Id. (citing Cuddington v. Northern Indiana Public Service Co.

(NIPSCO), 33 F. 3d 813, 817 (7th Cir. 1994); Exbom v. Central States, Southeast and

Southwest Area Health and Welfare Fund, 900 F.2d 1138, 1142-43 (7th Cir. 1990)).

     Thus, our function in conducting this review is not "to decide whether we would

reach the same conclusion as the Plan or even rely on the same authority."  Tegtmeier v.

Midwest Operating Engineers Pension Trust Fund, 390 F.3d 1040, 1045 (7th Cir. 2004)

(citing Carr v. Gates Health Care Plan, 195 F.3d 292, 294 (7th Cir. 1999)).  We can

conclude that the administrator's decision was arbitrary and capricious only if we are very

confident that the plan administrator overlooked something important or otherwise

seriously erred in appreciating the significance of the evidence.  Patterson v. Caterpillar,

_____

[7](...continued)
empowered to interpret the Plan's provisions in accordance with its terms with respect to all
matters properly brought before it . . . including . . . matters relating to the eligibility of a
claimant for benefits under the Plan.  [The Board's] decision shall be final, subject only to a
determination by a court of competent jurisdiction that the committee's decision was arbitrary
and capricious."  AR 390.

Inc., 70 F.3d 503, 505 (7th Cir. 1995); Ruiz v. Continental Cas. Co., 400 F.3d 986, 991

(7th Cir. 2005) ("It is not enough that we might disagree with a fiduciary's decision

concerning benefits; we cannot overturn a decision to deny benefits unless the decision

was 'downright unreasonable.'").  We may not set aside a denial of benefits "if the denial

was based on a reasonable interpretation of the plan documents." Mers, 144 F.3d at 1021

(internal citation omitted).  Finally, when evaluating a plan administrator's decision under

the arbitrary and capricious standard, a court generally considers only the evidence that

was before the administrative body when it made its decision. Hess v. Hartford Life &

Accident Insurance Co., 274 F.3d 456, 462 (7th Cir. 2001); Hess v. Reg-Ellen Mach.

Tool Corp., 423 F.3d 653, 662 (7th Cir. 2005).


**II.     Gorman-Geisler's ERISA Claim**

ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant

in an employee benefit plan may bring a civil action to recover benefits due under the

terms of the plan.  Ms. Gorman-Geisler asserts that Federal Express improperly denied

her benefits to which she was entitled under the LTD plan.

In its motion for summary judgment, Federal Express asserts that the BRC's

decision to deny benefits to Ms. Gorman-Geisler was not an abuse of discretion.  Rather,

it argues, the denial was reasonable and supported by substantial evidence because there

were no significant objective findings in the record which supported Ms. Gorman-

Geisler's contention that she could not hold some compensable employment for twenty-

five hours per week.  This determination was made by each of the reviewing peer physicians independently, and in several cases was based in significant part on the findings of the functional capacity evaluation that Ms. Gorman-Geisler can do more at times than she currently states or perceives.

Ms. Gorman-Geisler objects to Federal Express's motion, asserting that she "should be allowed an opportunity to present a fresh and comprehensive appeal, including additional documents supporting her claim for Long Term Disability benefits" because of Federal Express's "poor development of the administrative record."  Pl.'s Resp. at 1.  Ms. Gorman-Geisler emphasizes that no treating physician diagnosed her as able to work; rather, Dr. Kowlowitz asserted that she was disabled and could not work more than twenty hours per week, and the functional capacity evaluation reflected that she "would not be a candidate to tolerate physical work. . . . [S]he can not return to work full time. She would have difficulty returning to any work activity due to her limitations as noted."[8] AR 31.  Ms. Gorman-Geisler also claims that the conclusions of her functional capacity evaluation are misconstrued, with great emphasis placed on her lack of competitive test performance but no emphasis placed on heart rate monitoring and clinically consistent pain behavior.  She asserts that "[m]ischaracterization of the functional capacity test conclusions and its validity alone should mandate that this case be remanded due to the

---

[8] Ms. Gorman-Geisler also asserts that because Dr. Cohan, one of the reviewing physicians, contacted Dr. Kowlowitz to obtain his opinion about whether Ms. Gorman-Geisler could work twenty-five hours per week, "Dr. Cohan obviously must have thought that Dr. Kowlowitz's opinion was needed or he would not have called to obtain his opinion. . . . Dr. Kowlowitz's opinion was necessary to any fair determination of disability."  Pl.'s Resp. at 6.

lack of fairness by the Committee and peer review doctors hired by Federal Express to fairly evaluate the record."  Pl.'s Resp. at 4.

Ms. Gorman-Geisler cites Kroll v. Prudential Insurance Company of America, 2005 WL 1865509 (S.D. Ind. 2005) (Barker, J.) in support of her argument.  In Kroll, we held that the administrator of a long-term disability plan had unreasonably and without explanation disregarded contrary evidence in the record related to the plaintiff's asserted disability, and remanded the case to allow the plaintiff to present a fresh appeal, including documents supporting his claim.

Ms. Gorman-Geisler's objections cannot withstand Federal Express's motion for summary judgment.  The record that was before the BRC reflects that five different peer physicians – Drs. Meyerson, Cohan, Goldberg, Riso, and Goldman – reviewed Ms. Gorman-Geisler's medical history, and each concluded independently that she was not "totally disabled" as that term is defined in the LTD Plan.  Dr. Lamb, who conducted an Independent Medical Evaluation of Ms. Gorman-Geisler, made the same determination. The fact that Dr. Kowlowitz, Ms. Gorman-Geisler's treating physician, determined otherwise is not dispositive.  As the Supreme Court held in Black and Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003), "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they

reject a treating physician's opinion."[9]  See also Sperandeo v. Lorillard Tobacco Co., 460

F.3d 866, 875 n.7 (7th Cir. 2006); Davis v. Unum Life Ins. Co. of America, 444 F.3d 569,

578 (7th Cir. 2006) ("Furthermore, reaching a decision amid such conflicting medical

evidence [among a treating physician and reviewing physicians] is a question of judgment

that should be left to [the plan administrator] under the arbitrary-and-capricious

standard.").

There is no evidence that the reviewing physicians failed to fairly consider the

entirety of Ms. Gorman-Geisler's record or mischaracterized any findings from her

functional capacity evaluation, and there is no requirement that the plan adminstrator

have commented on every relevant piece of evidence in its report.  This case is wholly

distinguishable from Kroll, in which the plan administrator completely failed to articulate

its reasons for rejecting the plaintiff's disability benefits claim.  Kroll, 2005 WL 1865509,

at *17.  Moreover, as Federal Express points out, there is no evidence that the benefits

plan at issue in Kroll required "significant objective findings" substantiating a disability,

as the LTD Plan at issue here does.[10]  The lengthy benefits denial letter issued to Ms.

Gorman-Geisler (AR 7-11) explains in detail precisely what documentation was reviewed

and why the BRC reached the conclusions it did.  Thus, we cannot conclude that the

---

[9] The Nord Court held that whether a "treating physician rule" would increase the
accuracy of disability determinations under ERISA plans was an empirical question better left to
the Secretary of Labor – who is charged with issuing regulations necessary and appropriate to
carrying out ERISA – than to courts.  Id. at 832.

[10] As described, the LTD Plan provides that "[p]ain, without significant objective
findings, is not proof of disability."  AR 332.

BRC's denial of total disability benefits to Ms. Gorman-Geisler constituted an abuse of its discretion in violation of ERISA.

Ms. Gorman-Geisler also asserts that the BRC failed to consult a qualified vocational expert in determining whether compensable employment existed for a person with her level of ability, education, and experience, and failed to obtain relevant documentation related to her Social Security disability award. Ms. Gorman-Geisler asserts that the peer physician reviewers cannot fairly evaluate her ability to work, and requests that she be allowed to pay for a vocational expert to review her case, as are often relied upon in Social Security Administration and Indiana Worker's Compensation Board disability determinations. Pl.'s Resp. at 6-7. She also asserts that "[f]airness requires" that information submitted in support of her Social Security disability award ought to be obtained and considered in her LTD Plan disability determination, but Federal Express made no effort to obtain such information. Id. at 2.

However, neither the terms of ERISA nor the provisions of the LTD Plan require the plan administrator to consult a vocational expert. See Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276, 1289-90 (10th Cir. 2002) (concurring with the rulings of five other circuits that there is no categorical requirement that a plan administrator consider the evidence of a vocational expert); Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420-21 (1st Cir. 2000) (holding that a vocational expert assessment was not required due to substantial evidence in the record demonstrating that the claimant had the ability to work). Moreover, ERISA imposes no requirement that

24

benefit plan administrators consider Social Security disability determinations in deciding whether to grant or deny benefits.  See Black and Decker Disability Plan v. Nord, 538 U.S. 822, 832-33 (2003) (noting "critical differences between the Social Security disability program and ERISA benefit plans"); Anderson v. Operative Plasterers' and Cement Mason's Int'l Ass'n Local No. 12 Pension and Welfare Plans, 991 F.2d 356, 358 (7th Cir. 1993) (holding that ERISA plan administrator's failure to consider an SSA finding was not unreasonable, even though plan administrator had never previously disagreed with SSA findings).

Though Federal Express was not required to seek or obtain a vocational expert or information related to Ms. Gorman-Geisler's Social Security disability award, Ms. Gorman-Geisler was certainly not prevented from introducing such evidence on her own behalf.  She did not do so – in fact, she confirmed to Federal Express on March 1, 2004 that all clinical data in support of her appeal claim had been submitted at that time.  AR 227.  Federal Express has demonstrated that it considered all the relevant evidence before it, and the law does not require it to have obtained any other information before reaching its decision.  The record does not demonstrate that Federal Express acted in an arbitrary and capricious manner or otherwise failed to comply with its statutory duties under ERISA.

## III.   Conclusion

Because we hold that the Federal Express Benefits Review Committee did not

abuse its discretion in denying Ms. Gorman-Geisler benefits under the LTD Plan, we

GRANT Federal Express's Motion for Summary Judgment and enter final judgment

accordingly.  IT IS SO ORDERED.


Date: _____08/28/2007_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Raymond F. Fairchild
rayfairchild@earthlink.net

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com

Colby S. Morgan Jr
FEDERAL EXPRESS CORPORATION
2005 Corporate Ave
Nashville, TN 38132

Hannesson Ignatius Murphy
BARNES & THORNBURG LLP
hmurphy@btlaw.com